IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                Criminal No.:  ELH-12-003

ANTHONY GRIFFIN,

Defendant.

**MEMORANDUM OPINION**

Anthony Griffin entered a plea of guilty in November 2012 to one count of Hobbs Act robbery.  ECF 29.  The plea was tendered pursuant to a Plea Agreement reached under Fed. R. Crim. P. 11(c)(1)(C).  ECF 30 (the "Plea Agreement").  It provided for alternative sentencing ranges, depending on whether defendant qualified as a career offender.  *Id*. ¶ 8.  At sentencing, in March 2013, the Court concluded that defendant was a career offender and sentenced him to 151 months of imprisonment.  ECF 38 (Judgment).  Griffin is currently serving his sentence at FCI Allenwood Medium.  ECF 50 at 11.

While self-represented, Griffin filed a "Motion To Reduce Sentence," pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  ECF 50.  It is supported by several exhibits.  ECF 50-1 to ECF 50-3. The Office of the Federal Public Defender ("FPD") subsequently undertook representation of Griffin, and filed a supplemental memorandum in support of his motion for compassionate release. ECF 55.  The memorandum is supported by several exhibits.  ECF 55-1 to ECF 55-4.  I shall refer to ECF 50 and ECF 55 collectively as the "Motion."

The Government opposes the Motion (ECF 63, the "Opposition"), supported by several exhibits.  ECF 63-1 to ECF 63-4.  And, Griffin has replied.  ECF 66 (the "Reply").  Griffin also

filed a Notice of Supplemental Authority regarding the case of *United States v. Green*, 996 F.3d 176 (4th Cir. 2021).  ECF 51.

No hearing is necessary to resolve the Motion.  For the reasons that follow, I shall grant the Motion.

## I.  Background

Griffin was indicted on January 4, 2012, on one count of Hobbs Act Robbery of the owner of a lingerie store called The Bottom Drawer, in violation of 18 U.S.C. § 1951(a).  ECF 1.  The robbery occurred in February 2007.[1]  Griffin entered a plea of guilty to the charge on November 26, 2012 (ECF 29), pursuant to a Plea Agreement.  ECF 30.  Under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("C Plea"), the parties agreed to a total sentence ranging between 120 and 151 months of imprisonment if the defendant qualified as a career offender under § 4B1.1 of the Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  ECF 30, ¶ 8.  But, the Plea Agreement also provided that if "the Defendant is not a Career Offender, the parties stipulate and agree that a sentence within the advisory guidelines range as determined by the Court at the time of sentencing is the appropriate disposition."  *Id.*  There was no agreement as to Griffin's criminal history or criminal history category.  *Id.* ¶ 7.

The Plea Agreement contemplated a final offense level of 19 if Griffin were not a career offender.  *Id.* ¶ 6.  However, if he were a career offender, the parties anticipated a final offense level of 29.  *Id.*  Further, the Plea Agreement provided that the government would recommend that

---

[1] The Court is unaware of the reason for the delay that ensued from the time of the offense until the Indictment.

Griffin's federal sentence be served concurrent with a Maryland State sentence that defendant was then serving.  ECF 30, ¶ 10.[2]

According to the factual stipulation in the Plea Agreement, on February 5, 2007, Griffin entered The Bottom Drawer, a lingerie store in Baltimore, for the purpose of committing a robbery. *Id*. ¶ 6(a).  Griffin engaged the store's owner in conversation and picked out several items he pretended he wanted to purchase, which he had the owner wrap and place in a bag.  *Id*.  After she did so, defendant told the owner, "this is a robbery," and instructed her to place the money from the cash register in the bag.  *Id*.  The owner placed approximately $200 in the bag.  *Id*.  Griffin then demanded that the owner give him her "diamond engagement ring," which she did.  *Id*.

At this point, a customer entered the store.  *Id*.  Griffin ordered the customer to the rear of the store, and forced the store owner to tie the customer's hands and feet with pantyhose.  *Id*.  He then tied the owner's hands and feet the same way.  *Id*.  A friend of the store owner, who was coming to meet the owner at the store, observed Griffin leave the store and, "suspecting that something was wrong, alerted a nearby policeman."  *Id*.  The police officer found both the owner and the customer in the rear of the store, where they had been unable to untie themselves.  *Id*.

The store owner subsequently identified Griffin from a photo lineup.  *Id*.  In addition, the owner told police that defendant's "mouth was red, as if he had been drinking a red beverage."  *Id*. A red Slurpee beverage straw and cup had been discarded by Griffin at a nearby jewelry store prior to the robbery, and defendant's DNA was recovered from the straw.  *Id*.  A clerk at the jewelry store identified Griffin from a photo lineup "as the man who drank and discarded the Slurpee at the store."  *Id*.

---

[2] Griffin has been in continuous State custody since his arrest in March 2010 for an unrelated robbery. ECF 55 at 3.  He was serving a 15-year sentence for robbery, imposed by the Circuit Court for Baltimore County in Case 03K10002166.  *See* ECF 35, ¶ 41.

Sentencing was held on March 19, 2013.  ECF 36.  At that time, Griffin was 44 years old. *See* ECF 35 (Presentence Report or "PSR") at 1.  The PSR determined that Griffin qualified as a career offender under U.S.S.G. § 4B1.1 on the basis of his current offense, as well as his prior Maryland convictions for assault with intent to rob and two counts of robbery with a deadly weapon.  *Id*. ¶¶ 22, 45.  As a career offender, and after three deductions for acceptance of responsibility, Griffin's final offense level was 29.  *Id*. ¶ 24.  Had Griffin not been a career offender, however, his final offense level would have been 19.  *Id*. ¶ 21.

Griffin had 14 criminal history points.  Therefore, with or without career offender status, defendant had a criminal history category of VI.  *Id*. ¶¶ 42-45.

Defendant's record includes numerous prior State convictions.  But, the offenses set forth in paragraphs 27 to 36 of the PSR did not score points.  *See* ECF 35, ¶¶ 27-36.

In 1985, in the Circuit Court for Baltimore City, Griffin was convicted of unlawful possession of heroin and sentenced to two years' incarceration, of which all but six months was suspended.  *Id*. ¶ 27. Although Griffin was 16 years old at the time of the offense, he was prosecuted as an adult.  Later in the year, Griffin was found in violation of probation and sentenced to six months' incarceration.  *Id*.  The same year, Griffin was convicted in the Circuit Court for Baltimore City of escape and sentenced to nine months' incarceration.  *Id*. ¶¶ 29-30.  By then he was 17 years of age.  Also in 1985, Griffin was convicted in the District Court for Baltimore City of unlawful possession of a controlled dangerous substance ("CDS") and making a false statement to a peace officer.  *Id*. ¶ 31.  He was sentenced to one year of incarceration for the drug offense and a concurrent sentence of six months for the false statement.  *Id*.

Griffin was convicted of unlawful possession of CDS in 1988 and sentenced to two years of incarceration, with all but six months suspended.  *Id*. ¶ 32.  In 1989, Griffin was convicted of

4

two counts of theft and received suspended sentences of one year of incarceration for each count. ECF 35, ¶ 33.  Griffin was convicted in the Circuit Court for Baltimore City in 1990 on charges of assault and theft in connection with an attempt to rob a laundromat, for which he was sentenced to 18 months' incarceration for each charge.  *Id*. ¶ 34.  Also in 1990, Griffin was convicted in the Circuit Court for Baltimore County of robbery with a deadly weapon and a handgun violation, for which he was sentenced to concurrent terms of five years' incarceration.  *Id*. ¶ 36.  Griffin was 21 years of age at the time.

In 1995, Griffin was convicted of theft in the District Court for Baltimore County and sentenced to two years' incarceration.  *Id*. ¶ 37.  The same year, Griffin was convicted in the Circuit Court for Baltimore City of assault with intent to rob, for which he was sentenced to five years' incarceration, all of which was suspended.  *Id*. ¶ 38.  Then, in 1997 he was found in violation of probation and sentenced to five years of incarceration.  *Id*.  Also in 1997, Griffin was convicted in the Circuit Court for Baltimore City of three counts of robbery with a deadly weapon and one count of resisting arrest, for which he was sentenced to twelve years' incarceration.  *Id*. ¶ 40.  And, in 2010, Griffin was convicted in the Circuit Court for Baltimore County of two counts of robbery, for which he was sentenced to concurrent terms of fifteen years' incarceration.  *Id*. ¶ 41.  He was serving that sentence at the time of the sentencing in this case.

Based on defendant's classification as a career offender under U.S.S.G. § 4B1.1, with an offense level of 29 and a criminal history category of VI, the Guidelines called for a period of incarceration ranging from 151 to 188 months.  ECF 35, ¶ 52.  Without the career offender enhancement, however, defendant would have had an offense level of 19 and a criminal history category of VI, and the Guidelines would have called for a sentence of incarceration ranging from 63 to 78 months.  ECF 55 at 8.  As noted, under the C Plea the parties agreed to a sentence ranging

between 120 and 151 months' imprisonment if defendant were a career offender, or a Guidelines sentence if he were not a career offender.  ECF 30, ¶ 8.

Defendant is 5'7" tall and, at sentencing, he weighed 170 pounds.  ECF 35, ¶ 65.  He reported "suffering from a chronic illness" that was unspecified, for which he was "diagnosed in approximately 1977," and which necessitated three medications daily.  *Id.*  Further, Griffin had been diagnosed with depression during one of his periods of incarceration, for which he briefly took Prozac.  *Id.* ¶ 63.  Griffin also reported using marijuana, beginning at age eleven, and he later used heroin and cocaine on a daily basis.  *Id.* ¶ 66.

Unfortunately, defendant's father was an alcoholic who was "completely absent" from his childhood.  *Id.* ¶ 59.  But, defendant maintained a close relationship with his mother.  *Id.* ¶ 60.  Defendant has two children, with whom he was not close.  *Id.* ¶ 61.

At sentencing, I determined that Griffin qualified as a career offender, and adopted the Guidelines calculations in the PSR, without change.  *See* ECF 39 (Statement of Reasons) at 1; ECF 46 at 1-2.  Consistent with the C Plea, I imposed a sentence of 151 months of imprisonment, which corresponded to the maximum sentence contemplated under the C Plea, and to the bottom of the Guidelines range.  ECF 38 (Judgment) at 2.  Sentence was imposed concurrent with defendant's Maryland State sentence.  *Id.*  And, I recommended Griffin's participation in a substance abuse program, including the Residential Drug Abuse Program at the Bureau of Prisons ("BOP").  *Id.*

On June 8, 2016, Griffin, represented by the FPD, filed a "Motion to Correct Sentence Under 28 U.S.C. § 2255," based on *Johnson v. United States*, 576 U.S. 591 (2015).  ECF 43. However, on March 6, 2017, the Supreme Court decided *Beckles v. United States*, ___ U.S. ___, 137 S. Ct. 886 (2017), holding that the Guidelines are not subject to *Johnson* challenges.  On September 18, 2017, the FPD moved to withdraw as counsel (ECF 44), which the Court granted.

ECF 45.  Subsequently, by Memorandum (ECF 46) and Order (ECF 47) of October 2, 2017, I denied Griffin's § 2255 motion.

As noted, Griffin is currently incarcerated at FCI Allenwood Medium.  ECF 50 at 11; ECF 63 at 28.  He has a projected release date of August 9, 2023, with a home detention eligibility date of February 9, 2023.  ECF 55 at 1; ECF 55-3 at 1-2.[3]  Including credit Griffin received for the period between March 30, 2010, and October 5, 2010 (*see* ECF 55-3 at 3), he has served about 111 months of his 151-month sentence, or approximately 74%.

The exhibits reflect that defendant has a disciplinary record at the BOP.  ECF 55-4.[4]  The first disciplinary infraction, which occurred on April 12, 2019, involved the use of narcotics.  *Id*. This infraction resulted in the disallowance of 41 days of good conduct time credit; disciplinary segregation for 30 days; and the loss of email, phone, and visiting privileges for six months.  *Id*. The second infraction, on September 2, 2020, involved phone abuse; Griffin "falsified contact list to allow another inmate to circumvent phone restrictions."  *Id*.  This infraction resulted in the disallowance of 27 days of good conduct time credit; disciplinary segregation for 30 days; and the loss of phone and visiting privileges for eight months.  *Id*.

Griffin's medical records reflect that he tested positive for COVID-19 in December 2020. ECF 55-1 at 2.  In March 2021 Griffin declined an opportunity to receive the Moderna COVID-19 vaccine.  *See* ECF 63 at 25-29; 63-4; ECF 66 at 11-14.  Griffin's Reply identifies several reasons that he characterizes as "very legitimate" to explain "why people may have trepidations about

---

[3] This is the release date given in Griffin's briefing and in the BOP records attached to his briefing. The BOP's online records indicate a current projected release date of February 16, 2024. *See Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Dec. 16, 2021).

[4] The government has not addressed defendant's disciplinary record.

these vaccines." ECF 66 at 11.  But, he does not attribute his refusal to any particular reason.  *Id*.
at 11-14.

Griffin represents that, if he is released, he will reside with his mother at her house in
Baltimore.  ECF 55 at 10.  Griffin's mother is described as "eager to have her son work with U.S.
Probation to obtain employment and needed treatment."  *Id*.

Defendant filed an administrative request for compassionate release on November 8, 2020,
which was denied by the Warden on November 20, 2020.  ECF 50-2; ECF 55 at 3; ECF 63 at 4-5;
ECF 63-1; ECF 63-2.   The government does not contest that Griffin has exhausted his
administrative remedies.  *See* ECF 63 at 18-19.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed."
18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United
States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395
(4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v.
United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is
"expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i)
provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was enacted as part
of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only
upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).
Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*,
*e.g*., *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v.
Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying

compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress enacted the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the

safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§

1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and

compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *see also United States v. Butts*, ___ Fed. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

To be sure, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*,

FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).  But, a district court abuses

its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized

factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises,"

or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Defendant filed his

motion for compassionate release in July 2020.  ECF 95.  At that time, the nation was "in the grip

of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA*

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v.*

*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the

worst public health crisis that the world has experienced since 1918.  *See United States v.*

*Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents

a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as

we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich.

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of December 20, 2021, COVID-19 has infected roughly 51 million Americans and caused approximately 807,000 deaths in this country. *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Dec. 20, 2021).

For a brief time, this country saw a reduction of COVID-19 cases.  In the fall, the trend became more favorable. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,     https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html        ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html.  (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL   AND   PREVENTION,     https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-

variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

And, more recently, the emergence of the Omicron variant, both around the world and in the United States, has sparked further cause for concern. Although much remains unknown about Omicron, including its severity and the effectiveness of vaccines against the variant, it is believed to be highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Authorities warn that there remain reasons for caution, including the relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the holiday season, which will lead to an increase in the number of indoor gatherings, where the virus can more easily spread. *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Most recently in December 2021, it again updated its

guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Dec. 14, 2021), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").

16

Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons,

the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer,

Moderna, and Johnson & Johnson).[8] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has expanded considerably, and the vaccine is now approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 71% of all persons twelve years of age and older are fully vaccinated. *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Dec. 20, 2021). And, 61% of the total U.S. population is fully vaccinated. *See id.* Moreover, nearly 61 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Dec. 20, 2021).

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine have been raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of December 20, 2021, the BOP had 135,446 federal inmates and 36,000 staff. And, by that date, the BOP had administered 273,729 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Dec. 20, 2021).

As of December 20, 2021, the BOP reported that 289 out of a total 135,446 federal inmates and 243 BOP staff out of some 36,000 staff members currently test positive for COVID-19; 41,779 inmates and 8,643 staff have recovered from the virus; and 273 inmates and seven staff members have died from the virus. Moreover, the BOP has completed 127,380 COVID-19 tests. *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Allenwood Medium, where the defendant is imprisoned, the BOP reported that as of December 20, 2021, out of a total of 1,155 inmates, four have tested positive, zero have died of COVID-19, and 440 inmates and 54 staff have recovered at the facility. In addition, 555 staff members and 1,926 inmates at the FCI Allenwood complex have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alm/ (last visited Dec. 20, 2021).

## IV. Discussion

### A.

Griffin argues that his health conditions place him at an increased risk of severe illness from COVID-19, and warrant a finding of extraordinary and compelling circumstances. ECF 55 at 4-7. Moreover, he contends that, in light of the sentencing factors in 18 U.S.C. § 3553(a), a

reduction of his sentence to time served is warranted.  He points to the fact that the career offender enhancement would no longer apply to him, as discussed, *infra*.  He also claims his age, modest disciplinary record, and his release plan warrant his release.  *Id*. at 7-11.

The government responds that Griffin's health conditions are not serious enough to warrant a finding of extraordinary and compelling circumstances, particularly given the fact that he had previously contracted COVID-19 and he has refused the COVID-19 vaccine.  ECF 63 at 19-29.  Further, it asserts that, when evaluating the § 3553(a) factors, Griffin's extensive criminal history and the serious nature of his offense warrant the denial of his Motion.  *Id*. at 29-33.

Griffin identifies four health conditions that he contends warrants his release: HIV; a body mass index ("BMI") of 25.4, making him overweight; prediabetes; and hyperlipidemia.  ECF 55 at 4-5.[9]  The CDC is clear that "[h]aving HIV (Human Immunodeficiency Virus) can make you more likely to get severely ill from COVID-19."  *People with Certain Medical Conditions*, *supra*.  Likewise, being overweight, defined as having a BMI of 25 or above, renders someone more likely to get severely ill from COVID-19.  *Id*.  As for diabetes, the CDC affirms that diabetes itself can make someone more likely to get seriously ill from COVID-19.  But, it does not make the same assertion as to prediabetes.  *Id*.; *see also Frequently Asked Questions: COVID-19 and Diabetes*, AM. DIABETES ASS'N, https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes (last visited Dec. 16, 2021).  And, the CDC does not mention hyperlipidemia or high cholesterol as increasing the risk for severe illness from COVID-19.  *See People with Certain Medical Conditions*, *supra*

---

[9] Hyperlipidemia refers to high cholesterol. *See Hyperlipidemia*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/21656-hyperlipidemia (last visited Dec. 16, 2021).

Griffin's BMI of 25.4 narrowly places him within the "overweight" category, which begins at a BMI of 25.  Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly together with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, ___ F. Supp. 3d ___, 2021 WL 1890770, at *2 (E.D. Cal. May 11, 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding defendant with a BMI of 32.5 was obese qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

On the other hand, a number of courts have declined to find grounds for compassionate release even when considering defendants with higher BMIs. *See, e.g.*, *United States v. Waugh-Hixon*, PWG-19-137, 2021 WL 4750713, at *3 (D. Md. Oct. 21, 2021) (BMI of 30); *United States v. Lucero*, No. 16-CR-3040-DMS, 2021 WL 1297828, at *2 (S.D. Cal. Apr. 7, 2021) (BMI of 29); *United States v. Leondi*, Crim. No. 17-527 (SDW), 2021 WL 717361, at *2 (BMI of 29.6); *United States v. Moore*, Crim. No. 18-474, 2021 WL 308331, at *2 (E.D. Penn. Jan. 29, 2001) (finding that defendant's "slightly elevated BMI of 25 does not justify his release," and noting that "[c]ourts have consistently denied compassionate release to inmates with significantly higher BMI levels."); *United States v. Dunich-Kolb*, Crim. No. 14-150 (KM), 2020 WL 6537386, at *6 (BMI of 27.7).

A number of courts have found that prediabetes alone is not sufficient to constitute an extraordinary and compelling reason in the context of COVID-19. *See, e.g.*, *United States v. Manning*, 5 F.4th 803, 807 (7th Cir. 2021) (noting prediabetes is not recognized by the CDC as increasing risk); *United States v. Evans*, CCB-18-234, 2021 WL 3725421, at *1 (D. Md. Aug. 23, 2021) (same); *United States v. Freeman*, No. 13-CR-50071, 2021 WL 843456, at *1 (N.D. Ill. Mar. 5, 2021) (same); *United States v. Mungarro*, No. 07-20076, 2020 WL 6557972, at *2-3 (E.D. Mich. Nov. 9, 2020) (noting roughly one in three Americans are prediabetic); *United States v. Hall*, JKB-04-323, 2020 WL 4582712, at *2 (D. Md. Aug. 10, 2020).

And, because the CDC does not include hyperlipidemia as a condition that makes someone more likely to get severely ill from COVID, courts have rejected compassionate release requests premised on hyperlipidemia. *See, e.g.*, *United States v. Contreras*, 504 F. Supp. 3d 1052, 1059 (D.S.D. 2020) ("There is no showing that suffering from hyperlipidemia . . . increases [defendant's] risk of complications."); *United States v. Saccoccia*, Cr. No. 91-115-ML, 2020 WL 6153694, at *2 (D.R.I. Oct. 19, 2020) ("Defendant's hyperlipidemia is not listed by the CDC as a

comorbidity rendering him especially susceptible to COVID-19."), *aff'd*, 10 F.4th 1 (1st Cir. 2021); *United States v. Faucette*, No. 2:13-cr-79-DBH, 2020 WL 5640587, at *1 n.4 (D. Me. Sept. 22, 2020) ("The CDC has not mentioned high cholesterol as a risk factor.").  On the other hand, some judges in this District have found extraordinary and compelling circumstances for defendants who had multiple medical conditions that included hyperlipidemia.  *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23, 2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis).

In any event, the defendant is HIV-positive, and the CDC plainly lists HIV as a condition that can make it more likely for one to become severely ill from COVID-19.  Griffin appears to be on medication for his HIV.  ECF 63-3 at 5.  But, the government observes, based on defendant's medical records, that his HIV is "asymptomatic," and it notes that defendant has "never had an HIV-related illness."  *Id.* at 2.

Some courts have found that when an inmate's HIV is adequately managed, status as HIV positive does not provide grounds for compassionate release.  *See, e.g.*, *United States v. Richardson*, No. 5:18-cr-00291, 2021 WL 1526431, at *4 (E.D. Pa. Apr. 19, 2021) (denying compassionate release when HIV was well-controlled and defendant was asymptomatic); *United States v. Jackson*, No.: 8:09-cr-478-VMC, 2021 WL 1293572, at *2 (M.D. Fla. Apr. 7, 2021) (denying compassionate release when defendant's HIV was asymptomatic); *United States v. Mathis*, No. 2:07-cr-266, 2021 WL 1099594, at *3 (S.D. Ohio Mar. 23, 2021) (denying

compassionate release when HIV is effectively being treated); *United States v. Esmond*, No. 18-15 (SDW), 2020 WL 4915669, at *2-3 (D.N.J. Aug. 21, 2020) (denying compassionate release when HIV effectively treated defendant was asymptomatic).

But, as I see it, the fact that Griffin's HIV condition is being managed does not diminish its significance, especially in light of defendant's elevated BMI.  *See, e.g.*, *United States v. Ayala-Pizarro*, CCB-13-407, 2021 WL 1265233, at *2 (D. Md. Apr. 6, 2021) (defendant's status as HIV-positive and obese constituted extraordinary and compelling circumstances, although the Government did not contest this); *Bruno v. United States*, 472 F. Supp. 3d 279, 283-84 (E.D. Va. 2020) (granting compassionate release for HIV-positive status and mental health conditions because of continuing risk).

I also reject the government's suggestion that defendant has not demonstrated extraordinary and compelling reasons because he has already had COVID-19.  What Judge Chuang said in *United States v. Fletcher*, Crim. No. TDC-05-0179, 2020 WL 3972142, at *3 (D. MD. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from the coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity."  *See also United States v. Heyward*, Crim. No. PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible"); *United States v. Kess*, Crim. No. ELH-14-480, 2020 WL 3268093, at *6-7 (D. Md. June 17, 2020) (granting compassionate release to someone who had recovered from COVID-19 without requiring hospitalization and noting that "other jurists have released inmates who have ostensibly recovered from COVID-19 based on extraordinary and compelling health reasons").

Nevertheless, Griffin's decision to refuse the COVID-19 vaccine weighs against him, and substantially weakens his argument for compassionate release. The CDC has emphasized that "COVID-19 vaccines are effective at helping protect against severe disease and death from the virus that causes COVID-19, including known variants currently circulating (e.g., Delta variant);" that "[e]veryone ages 5 years and older should get a COVID-19 vaccination as soon as possible;" and that "COVID-19 vaccines are safe and effective." *Key Things to Know about COVID-19 Vaccines*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html (updated Nov. 30, 2021).

Indeed, I have previously joined a growing number of district court judges across the country, including in the District of Maryland, in reasoning that a prisoner's refusal to obtain a COVID-19 vaccine significantly undermines the claim that his susceptibility to the effects of COVID-19 constitutes grounds for compassionate release. As Judge Gallagher has observed: "Courts now widely recognize that a refusal to take preventative measures to protect oneself from COVID-19 undermines any assertion that the risk of viral infection constitutes an extraordinary and compelling reason justifying release. . . . Any decision to the contrary would create a perverse incentive in favor of declining the vaccine, undermining the BOP's efforts to protect its incarcerated population and to allow prison operations to return to some degree of normalcy in the coming months." *United States v. Ayres*, SAG-04-004, 2021 WL 2352322, at *2 (D. Md. June 9, 2021) (collecting cases); *see United States v. Dempsey*, 1:19-cr-368 (TNM), 2021 WL 2073350, at *3–4 (D.D.C. May 24, 2021) (reasoning similarly); *United States v. Smith*, SAG-20-47, 2021 WL 1733457, at *2 (D. Md. May 3, 2021); *accord United States v. Simpson*, SAG-16-0398, 2021 WL 2260379, at *2 (D. Md. June 3, 2021); *United States v. Cain*, 1:16-CR-00103-JAW, 2021 WL

2269974, at *7 (D. Me. June 3, 2021); *United States v. Brice*, SAG-07-0261, 2021 WL 1926713, at *3 (D. Md. May 13, 2021); *United States v. Ortiz*, 5:18-CR-00264, 2021 WL 1422816, at *4 (E.D. Pa. Apr. 15, 2021); *United States v. Piles*, CR 19-292-5 (JDB), 2021 WL 1198019, at *3 (D.D.C. Mar. 30, 2021) (collecting cases); *United States v. Siegel*, TDC-03-0393, 2021 WL 962491, at *2 (D. Md. Mar. 15, 2021); *United States v. Reynoso*, 525 F. Supp. 3d 253, 255 (D. Mass. 2021).

In his Reply, Griffin makes several arguments as to why his refusal to get vaccinated "does not defeat" his claim for compassionate release.  ECF 66 at 11.  He states: "There are very legitimate reasons, grounded both in history and in lived experience, as to why people may have trepidations about these vaccines."  *Id.*  Griffin notes that "vaccine skepticism is widespread," even among health care and correctional workers, and he contends that there are still questions as to the effectiveness of vaccines over the long term and whether vaccines significantly lower the overall risk of exposure.  *Id*. at 12-13.

But, the vaccine is central to preventing dangerous mutations.  *See, e.g.*, *Another Reason To Get Vaccinated? To Stop Variants From Developing*, HENRY FORD HEALTH SYS. (Sept. 27, 2021),  https://www.henryford.com/blog/2021/09/get-vaccinated-to-stop-variants.  Moreover, "vaccines are the best way to protect yourself and others against COVID-19."  Dr. Francis Collins, *Latest on Omicron Variant and COVID-19 Vaccine Protection*, NIH DIRECTOR'S BLOG (Dec. 14, 2021),  https://directorsblog.nih.gov/2021/12/14/the-latest-on-the-omicron-variant-and-vaccine-protection/.  The defendant's refusal to take the vaccine raises serious questions about his judgment.  It also suggests a lack of consideration for the well being of others, including his own mother, with whom he seeks to live if released.  *See* ECF 11 at 10.  This Court is unwilling to

credit arguments that would incentivize inmates not to receive the COVID-19 vaccine, or that cast doubt upon the vaccine's vital importance in thwarting the pandemic.

Yet, in the context of this case, defendant's refusal to get vaccinated is not dispositive of the threshold issue.  I conclude that, in light of defendant's HIV status, coupled with his mild obesity, he has established an extraordinary and compelling reason that merits consideration for release.

## B.

As noted, if a court finds extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A), it must still consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to exercise its discretion in favor of release.  *See, e.g.*, *High*, 997 F.3d at 186.  These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id*. at 186.

The defendant was born in March 1968 and is now 53 years of age.  ECF 35 at 1.  His prior criminal record is significant, and his record at the BOP is far from perfect.  The defendant's prior record and his conduct while in custody weigh against release.

Defendant's recent infractions are troubling.  Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see United States v. Lancaster*, 997 F.3d 171, 175 (4th Cir. 2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his

initial sentencing."); *United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).

On the other hand, as part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today for the same offense.  As Judge Bennett has explained: "[C]hanges in the sentence law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public."  *United States v. Johnson*, No. RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020).  *See also, e.g., McCoy*, 981 F.3d at 285-86; *United States v. Stockton*, ELH-99-352, 2021 WL 1060347, at *14 (D. Md. Mar. 17, 2021); *United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020).  A recent change in the law weighs heavily here, for the reasons that follow.

The government entered into a C Plea with the defendant.  The range of the agreed upon sentence turned on whether defendant qualified as a career offender.  In particular, the Plea Agreement contemplated that if Griffin were not a career offender, "the advisory guidelines range as determined by the Court at the time of sentencing is the appropriate disposition."  ECF 30, ¶ 8.

U.S.S.G. § 4B1.1(a) provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Section 4B1.2(a) states, in part:

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that –

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or . . . .

The Guidelines are merely advisory, not mandatory.  *See*, *e.g.*, *United States v. Booker*, 543 U.S. 220, 260-62 (2005); *Rita v. United States*, 551 U.S. 338, 361-62 (2007).  But, it is equally clear that the sentencing Guidelines are the "foundation of federal sentencing decisions." *United States v. Hughes*, ___ U.S. ___, 138 S. Ct. 1765, 1775 (2018).  Indeed, the Guidelines range generally serves as the "starting point" in the effort of a judge to fashion a reasonable sentence. *Freeman v. United States*, 564 U.S. 522, 529 (2011).  Thus, the Supreme Court has described the sentencing Guidelines as "the lodestone of sentencing."  *Peugh v. United States*, 569 U.S. 530, 544 (2013).  Because of their "central role in sentencing," an "error related to the guidelines can be particularly serious."  *Molina-Martinez v. United States*, 578 U.S. 189, 191 (2016); *see United States v. Winbush*, 922 F.3d 227, 231 (4th Cir. 2019); *United States v. Carthorne*, 878 F.3d 458, 469 (4th Cir. 2017).

"[T]he career offender provision is an advisory guideline promulgated by the United States Sentencing Commission.[1]" *United States v. Furlow*, 928 F.3d 311, 314 (4th Cir. 2019), *judgment vacated on other grounds*, 140 S. Ct. 2824 (2020) (Mem.).[10]   Unlike the mandatory sentencing provisions applicable to an Armed Career Criminal, 18 U.S.C. § 924(e), "the career offender provision creates no statutory penalty." *Id*. at 314.   The career offender provision merely serves to guide the court in arriving at a reasonable sentence.   Because it is not mandatory, a district court may vary from the career offender Guidelines sentencing range. *United States v. Foote*, 784 F.3d 931, 941 (4th Cir. 2015).   Nevertheless, as is evident here, a defendant who qualifies for an enhancement as a career offender "may be subject to an increased guidelines offense level and criminal history category, which would result in an increased Guidelines range." *Furlow*, 928 F.3d at 314  (citing U.S.S.G. § 4B1.1(b)).

Of import here, in *United States v. Green*, 996 F.3d 176 (4th Cir. 2021), the Fourth Circuit recently held that "Hobbs Act robbery is not a crime of violence under the career offender provision of the Sentencing Guidelines." *Id.* at 184. Therefore, if Griffin were sentenced today, he would not qualify as a career offender.   The government concedes, as it must, that as a result of *Green*, "it is true that Petitioner would not face the same guidelines range if he had been sentenced today."   ECF 63 at 30.   Nonetheless, the government argues the Court should not reduce defendant's sentence because "*Green* is not retroactively applicable to Petitioner's case." *Id.*

Yet, the government fails to address the significance of its own Plea Agreement.   There, it expressly agreed to recommend a sentence within the Guidelines range that would apply if defendant were not a career offender.   And, he clearly is not a career offender.

---

[10] The Sentencing Commission is the agency within the judiciary that "Congress has tasked with promulgating 'guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case.'" *Furlow*, 928 F.3d at 314 n.1 (quoting 28 U.S.C. § 994(a)(1)).

The Court found defendant to be a career offender, under U.S.S.G. § 4B1.1(a).  Therefore, defendant's sentence dramatically increased.  And, I did not calculate defendant's non-career offender Guidelines, in light of the career offender determination.  But, there is no dispute as to defendant's non-career offender offense level (19) or his criminal history score (VI).  Therefore, then, as now, the Guidelines are readily ascertainable.  The non-career offender Guidelines called for a sentence ranging from 63 to 78 months of incarceration.  ECF 55 at 8.  And, that range takes into account defendant's restraint of the victims and his troubling prior record.

Equally important, that was the range to which the government had expressly agreed in the C Plea.  Remarkably, the government offers no explanation to justify its position here, which is tantamount to reneging on its promise, as laid out in the Plea Agreement.  *See* ECF 63 at 29-33.

In my view, the government's position is at odds with its role as a "'minister[] of justice.'" *United States v. Rolle*, 204 F.3d 133, 138 n.7 (4th Cir. 2000) (citation omitted).  As Justice Sutherland famously said long ago in *Berger v. United States*, 295 U.S. 78, 88 (1935), the government's interest "in a criminal prosecution is not that it shall win a case but that justice shall be done."

Notably, the defendant has already served 105 months in continuous custody on this offense—more than two years longer than the high-end of the correct Guidelines range.[11]  That range accounts for the nature and circumstances of the offense and Griffin's prior record. The Guidelines range that would apply today is highly relevant to the Court's consideration of whether a time served sentence adequately accounts for the seriousness of the offense, Griffin's prior record, and the avoidance of unwanted sentencing disparities, as required by the § 3553(a) sentencing factors.

---

[11] And, as indicated, the defendant's custody with the State of Maryland began in 2010.

## V.  Conclusion

For the reasons set forth above, I shall grant the Motion.  I shall reduce the defendant's sentence to time served plus 14 days.  I shall also reimpose the original terms of supervised release, with the added condition of a period of six months of home confinement.

An Order follows, consistent with this Memorandum Opinion.

Date: December 22, 2021                                        _____/s/_____
                                                                            Ellen L. Hollander
                                                                            United States District Judge

34